Brendan Nafarrate (SBN#339880)
Ventura County Public Defender's Office
800 S. Victoria Avenue Room 207
Ventura, California 93009
Telephone: 805-477-7108
Email: brendan.nafarrate@venturacounty.gov
Attorney for Petitioner

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

PETRY HERNANDEZ-GRANADOS,

Petitioner,

v.

FERETI SEMAIA; Warden, Adelanto ICE Processing Center. MARKWAYNE MULLIN, Secretary of the United States Department of Homeland Security; TODD BLANCHE, Attorney General of the United States; DAVID J. VENTURELLA, Acting Director of United States Immigration and Customs Enforcement

Respondents.

**Case No.: 5:26-cv-5837**

**PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241;**

**VERIFIED PETITION**

**PETITIONER'S DHS NO: A 213-014-940**

## INTRODUCTION

1. In violation of due process, Petry Hernandez-Granados ("Petitioner") is being unlawfully detained by Respondents at the Adelanto Immigration and Customs Enforcement ("ICE") Processing Center ("Adelanto").

2. Petitioner entered the United States without inspection in 2002, when he was just sixteen years old. He has lived in Ventura County, California for the last fifteen years of his over twenty-four years in the United States. While here, he has fathered two United States Citizen children, been committed to his wife, and worked hard to provide for his family.

3. On September 13, 2026, after his release from the Ventura County jail, Petitioner was apprehended by ICE without a warrant, without a bond setting, and without any pre-deprivation process, including determination of flight risk or danger to the community.

4. ICE took him to Adelanto, where he has been since September 13, 2026.

5. In the interim, Petitioner requests the Court maintain the orders that he not be removed from this judicial district or removed from the United States, pending disposition of his petition for writ of habeas corpus.

## JURISDICTION AND VENUE

6. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1651 (All Writs Act), 28 U.S.C. §§ 2201–02 (Declaratory Judgment Act), 28 U.S.C. § 2241 (habeas corpus), Article I, § 9, cl. 2 of the U.S. Constitution (the Suspension Clause), the Fourth and Fifth Amendments to the U.S. Constitution, and 5 U.S.C. §§ 701-706 (Administrative Procedure Act).

7. Venue is proper in this district and division pursuant to 28 U.S.C. § 2241(a) and 28 U.S.C. § 1391(b)(2) and (e)(1) because Petitioner is physically detained within this district. *See Braden v. 30th Judicial Circuit Court of Kentucky*, 410 U.S. 78 484, 493- 500 (1973). Venue is also properly in this Court pursuant to 28 U.S.C. § 1391(e) because Respondents are employees, officers, and agencies of the United

States, and because a substantial part of the events or omissions giving rise to the claims occurred in the Central District of California.

## PARTIES

8. Petitioner is alleged to be a citizen of Mexico who has been in immigration detention since September 13, 2026. (Nafarrate decl. at ¶¶ 3, 5). Petitioner was arrested by ICE without a warrant in Ventura, California, and no bond was set, nor was any pre-deprivation process provided, and Petitioner has been at Adelanto without any custody hearing ever since. (*Id.* at ¶ 8).

9. Respondent Markwayne Mullin is the Secretary of the Department of Homeland Security. He is responsible for the implementation and enforcement of the Immigration and Nationality Act and oversees ICE, which is responsible for Petitioners' detention. Mr. Mullin has ultimate custodial authority over Petitioner. He is sued in his official capacity.

10. Respondent Todd Blanche is the Attorney General of the United States. He is responsible for the Department of Justice, of which the Executive Office for Immigration Review, and the BIA and immigration court system it operates, is a component agency. He is sued in his official capacity.

11. Respondent David J. Venturella is the Acting Director of Immigration and Customs Enforcement, a federal law enforcement agency within the Department of Homeland Security. ICE's responsibilities include operating the immigration detention system. In his capacity as ICE Acting Director, Respondent Venturella exercises control over and is a custodian of persons held at ICE facilities nationally. He is Petitioner's immediate custodian and is responsible for Petitioners' detention. He is sued in his official capacity.

12. Respondent Fereti Semaia is the Warden of Adelanto, where Petitioner is detained. He has immediate physical custody of Petitioner. He is sued in his official capacity.

## FACTUAL BACKGROUND

13. Petitioner was born in Mexico on January 11, 1986. He came to the United States

in 2002, at sixteen years old. (Nafa. decl. at ¶¶ 5-7).

14. Over the next twenty-four years, Petitioner and his family built a life in Ventura County, California. He has fathered two children who are United States citizens with his wife, and he works hard to provide for his family and has been gainfully employed in the landscaping and arboriculture industries since 2002. (*Id.* at ¶¶ 6-7).

15. Petitioner's family is suffering in his absence, as he was the primary income source. He is despondent and emotionally distressed being stuck in detention. (*Id.* ¶ 4).

16. Petitioner filed for asylum in 2017 and had been working with an Employment Authorization Document ("EAD") ever since. (*Id.* at ¶¶ 10-11). Additionally, Petitioner had monthly check-ins with Agent Medina of the Intensive Supervision Appearance Program ("ISAP") prior to his warrantless arrest since about 2017, after his release from Adelanto. (*Id.* at ¶ 9).

17. Petitioner was arrested by ICE outside the Ventura County jail without a warrant or pre-deprivation process on September 13, 2026. (*Id.* at ¶ 8). He has been at Adelanto ever since.

## LEGAL BACKGROUND

18. The Constitution establishes due process rights for "all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." Hernandez v. Sessions, 872 F.3d 976, 990 (9th Cir. 2017) (quoting *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001)). These due process rights are both substantive and procedural.

19. *First*, the procedural component of the Due Process Clause prohibits the government from imposing even permissible physical restraints without adequate procedural safeguards. Civil detention violates due process unless it is accompanied by strong procedural protections to guard against the erroneous deprivation of liberty, including a hearing before a neutral decisionmaker on the basis for detention. *Zadvydas*, 533 U.S. at 690–91; *Foucha v. Louisiana*, 504 U.S. 71, 81–83 (1992); *Kansas v. Hendricks*, 521 U.S. 346, 364–69 (1997); *U.S. v.*

*Salerno*, 481 U.S. at 750–52; *see also Gomez Romero v. Wamsley*, No. C-25-2207-JHC-MLP, 2025 WL 3628633, at *1 (W.D. Wash. Dec. 8, 2025) ("The absence of pre-deprivation procedures creates a high risk of erroneous liberty deprivation."). Even for deprivations of liberty far less serious than detention, the Due Process Clause requires that individuals receive notice and an opportunity to be heard in a meaningful manner and at a meaningful time before the government may deprive them of liberty. *E.g.*, *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976); *see Salcedo Aceros v. Kaiser*, No. 25-cv-06924-EMC-EMC, 2025 WL 2637503, at *5 (N.D. Cal. Sept. 12, 2025) ("The constitution typically 'requires some kind of a hearing *before* the State deprives a person of liberty or property.' *Zinermon v. Burch*, 494 U.S. 113, 127, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). This is particularly true when the interest is in liberty, the loss of which cannot be fully compensated after the fact.").

20. *Second*, "[t]he touchstone of due process is protection of the individual against arbitrary action of government," *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974), including "the exercise of power without any reasonable justification in the service of a legitimate governmental objective," *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). These protections extend to noncitizens facing detention, as "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *Salerno*, 481 U.S. at 755. Accordingly, "[f]reedom from imprisonment -- from government custody, detention, or other forms of physical restraint -- lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690.

21. Substantive due process thus requires that all forms of civil detention—including immigration detention—bear a "reasonable relation" to a non-punitive purpose. *See Jackson v. Indiana*, 406 U.S. 715, 738 (1972). The Supreme Court has recognized only two permissible non-punitive purposes for immigration detention: ensuring a noncitizen's appearance at immigration proceedings and preventing

danger to the community. *Zadvydas*, 533 U.S. at 690–92; *see also Demore v. Kim*, 538 U.S. 510 at 519–20, 527–28, 31 (2003).

## ARGUMENT

### A. Petitioner's Detention Violated Procedural Due Process

22. The Fifth Amendment protects all persons in the United States, including noncitizens, from deprivation of liberty without due process of law. Most notably, freedom from physical restraint. *See Zadvydas*, 533 U.S. at 690-91.

23. Prior to his detention, Petitioner was entitled to notice and a "pre-detention hearing before a neutral decisionmaker where [the government bore] the burden of demonstrating by clear and convincing evidence that Petitioner [was] a flight risk or a danger such that his physical custody [was] required." *Medrano-Rocha*, 2026 WL 411355, at *7 (granting petitioner's TRO and ordering such a hearing prior to any subsequent re-arrest of petitioner). This high burden is required because "the immigrant's initial release reflected a determination by the government that the noncitizen is not a danger to the community or a flight risk. Since it is the government that initiated re-detention, it follows that the government should be required to bear the burden of providing a justification for the re-detention." *Castellon*, 2025 WL 2373425, at *12 (rejecting the government's arguments that the burden for a parole revocation hearing should be on petitioner) (discussing *Garro Pinchi v. Noem*, 792 F. Supp. 3d 1025, 1034–35 (N.D. Cal. 2025)).

24. Courts in this Circuit use the *Mathews*, 424 U.S. at 335, framework to analyze due process claims in this context, which considers: (1) the private interest at stake; (2) the risk of erroneous deprivation; and (3) the Government's interest. *See Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1206-07 (9th Cir. 2022) (applying *Mathews* in a constitutional challenge to detention under 8 U.S.C. § 1226(a)); *Mody v. Warden*, 2026 WL 51976, at *5 (C.D. Cal. Jan. 5, 2026) (same). Here, the *Mathews* factors each weigh heavily in Petitioner's favor.

#### 1. <u>Petitioner has a Significant Liberty Interest at Stake</u>

25. Petitioner has a vested liberty interest in remaining free from detention, which he had done for over nine years prior to his previous detention, while working to provide for his children. His detention without notice or a pre-deprivation hearing directly infringed upon his core liberty interest protected by the Fifth Amendment. *See Salerno*, 481 U.S. at 755; *Zadvydas*, 544 at 693 (2001).

26. Individuals who have been released from custody—even if conditional—have a liberty interest in their continued freedom. *E.g.*, *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972). This is true in the immigration context as well. "Just as people on preparole, parole, and probation status have a liberty interest, so too does [a noncitizen] have a liberty interest in remaining out of custody on bond." *Ortega v. Bonnar*, 415 F. Supp. 3d 963, 969 (N.D. Cal. 2019); *accord Garro Pinchi*, 792 F. Supp. 3d 1025, 1032–33 (collecting cases for the proposition that "even when ICE has the initial discretion to detain or release a noncitizen pending removal proceedings, after that individual is released from custody she has a protected liberty interest in remaining out of custody"). The government's decision to grant a noncitizen release "creates 'an implicit promise,' upon which that individual may rely, that their liberty 'will be revoked only if [they] fail[ ] to live up to the . . . conditions [of release].'" *Garro Pinchi*, 792 F. Supp. 3d at 1032 (citing *Morrissey*, 408 U.S. at 482). Indeed, where a noncitizen "'was released from civil immigration detention after his initial apprehension and is now re-detained,'" that liberty interest gives rise to a due process requirement of "notice and a pre-deprivation hearing before detention." *Gudavasov v. Marin*, No. 5:26-cv-00541-AH-(MBK), 2026 WL 712827, at *3 (C.D. Cal. Mar. 9, 2026) (quoting *Perez Bueno v. Janecka*, No. 5:25-cv-03376-CAS-BFM, 2026 WL 309934, at *3 (C.D. Cal. Feb. 5, 2026) (ordering immediate release for petitioner previously released on OREC and re-detained after sixteen alleged ISAP violations)).

27. As many courts in this Circuit have found, this reasoning extends to individuals whom immigration officials chose not to detain despite being aware of their

presence. *See, e.g.*, *Kharitonova v. Albarran*, No. 3:26-cv-01362-JSC, 2026 WL 531441, at *2 (N.D. Cal. Feb. 25, 2026) (liberty interest for petitioner who entered with a tourist visa and had a pending asylum application when detained because "[a]lthough the government did not detain and then release her, it made a decision *not* to detain her in the first place"); *E.E.O.H. v. Noem*, No. 1:26-cv-01266-JLT-SAB-HC, 2026 WL 850363, at *5 (E.D. Cal. Mar. 26, 2026) (applying *Kharitonova* and finding petitioner's pending asylum application and work permit gave rise to a "protected liberty interest in his continued freedom"), *report and recommendation adopted*, 2026 WL 967670 (E.D. Cal. Apr. 9, 2026); *Abdeltawab v. Armant*, No. EDCV 26-01520-MWF (DTB), 2026 WL 1045564, at *2 (C.D. Cal. Apr. 13, 2026) ("That principle extends to those like Petitioner who have never been in immigration custody in the first place due to years of deliberate acquiescence by Respondents."); *Kalkan v. Chestnut*, No. 1:26-cv-02028-DAD-EFB, 2026 WL 788112, at *1 (E.D. Cal. Mar. 20, 2026) (ordering immediate release for petitioner who was detained with pending applications for affirmative relief); *Njafuh v. Andrews*, No. 1:26-cv-03436-DAD-AC (HC), 2026 WL 1346860, at *1 (E.D. Cal. May 14, 2026) ("[P]etitioner's application for asylum has been pending for nearly a year and his TPS status was terminated on June 7, 2025. Respondent did not detain petitioner at that time, thus providing him with a liberty interest such that due process entitles him to a pre-deprivation hearing prior to any re-detention."); *Mayank v. Robbins*, 2026 WL 788128, *1 (Mar. 20, 2026) (adopting *Kharitonova* for petitioner with pending asylum application never previously detained).

28. Any contention that Petitioner lacks a liberty interest because the government never sought to detain him previously is "specious" and "unsupported by any legal authority." *Kharitonova v. Albarran*, 2026 WL 531441, at * 2 (N.D. Cal. Feb. 25, 2026). "Although the government did not detain and then release [him], it made a decision *not* to detain [him] in the first place; Petitioner thus has the same liberty

interest in [his] continued freedom as an individual initially detained." *Id.* (citing *Barco Mercado v. Francis*, 811 F. Supp. 3d 487, 494 (S.D.N.Y. Nov. 26, 2025) (attaching appendix identifying "'350 [ ] cases decided by over 160 different judges sitting in about 50 different courts spread across the United States'" 'overwhelmingly' finding individuals detained and then released had a vested liberty interest")); *see Hurd v. D.C. Gov't*, 864 F.3d 671, 683 (D.C. Cir. 2017) ("[A] person who is in fact free of physical confinement—even if that freedom is lawfully revocable—has a liberty interest that entitles him to constitutional due process before he is re-incarcerated.").

29. Even noncitizens who entered the United States without inspection or any contact with immigration authorities can have a strong interest in remaining free from custody in the context of the *Mathews* factors. *See Chaparro Ayala v. Albarran*, No. 26-CV-09430-CRB, 2026 WL 2722780, at *4 (N.D. Cal. Sept. 15, 2026) (citing *Chiguil Chiguil v. Noem*, No. 26-cv-1844 DAD CSK, 2026 WL913195, at *5 (E.D. Cal. April 3, 2026)); *see also Valtierra Moreno v. Mullin*, No. 26-cv-04291-MAR, at *4-7 (C.D. Cal. Sept. 22, 2026) (applying the *Mathews* factors and finding noncitizen who entered without inspection's due process rights were violated). Courts consider not only release by immigration authorities but also a noncitizen's length of residency, their work history, and their community ties in assessing their liberty interest. *Rico-Tapia v. Smith*, 806 F. Supp.3d 1166, 1183 (D. Haw. 2025).

30. Petitioner entered without inspection in 2002 as a minor but has been presenting himself to immigration authorities. He was detained at Adelanto in 2017 and released. Since then, he has submitted an asylum application the courts, applied for and renewed his EAD and engaged in monthly monitoring through ISAP. Thus, he developed a specific and protected private liberty interest in remaining out of custody. *See Garro Pinchi*, 792 F. Supp. 3d at 1032 ("Even individuals who face significant constraints on their liberty or over whose liberty the government

wields significant discretion retain a protected interest in their liberty.") (collecting cases); *Padilla v. Bowen*, No. 2:25-CV-10780-CAS-SK, 2025 WL 3251368, at *1–2, 10 (C.D. Cal. Nov. 21, 2025) ("That Petitioner is deprived of his right to live with his family and to work underscores Petitioner's 'weighty' liberty interest in remaining out of custody.").

31. Respondents were well aware of Petitioner's presence. Indeed, the government's decision not to detain Petitioner during their countless interactions over the years "gave rise to 'a liberty interest on Petitioner's part that he would remain free unless [he] violated [his] conditions of release.'" *Kharitonova v. Albarran*, 2026 WL 531441, at * 2 (N.D. Cal. Feb. 25, 2026); *E.E.O.H. v. Noem*, No. 1:26-cv-01266-JLT-SAB-HC, 2026 WL 850363, at *4 (E.D. Cal. Mar. 26, 2026); *see also Villanueva-Montanez v. Lyons,* No. 2:26-cv-00954-DAD-CKD, 2026 WL 797930, at *1 (E.D. Cal. Mar. 23, 2026) ("[T]he release (or decision not to detain) is 'based on an evaluation[,]' allows for 'a relatively normal life[,]' and as a result the parolee or petitioner 'relied on at least an implicit promise' that the parole or decision not to detain will be revoked only if he fails to live up to the applicable 'conditions.'" (first alteration added) (quoting *Morrissey*, 408 U.S. at 482)).

2. <u>This is a High Risk of Erroneous Deprivation</u>

32. The risk of erroneous deprivation of liberty without a pre-deprivation hearing is high. "Civil immigration detention is permissible only to prevent flight or protect against danger to the community." *See Garro Pinchi*, 792 F. Supp. 3d at 1035. Thus, there is a high risk of erroneous deprivation without a pre-deprivation hearing to ensure detention serves those permissible purposes. *See id.* The risk is especially elevated here, where there is no reason to believe that Petitioner is a flight risk nor a danger to the community, and where Petitioner has been living freely in his community for over twenty-four years. In failing to comply with 8 U.S.C. 1357(a)(2) by not obtaining a warrant to arrest Petitioner from the Attorney General, Respondents could not show that Petitioner was a danger or risk and

needed to be detained while in removal proceedings. Also, there is no indication that Petitioner committed or was caught committing a felony. Furthermore, no determination was made that Petitioner was a flight risk, which is highly unlikely considering his over twenty-four years living in Ventura County. In fact, no pre-deprivation process was done at all.

33. Thus, "the risk of erroneous deprivation of liberty is high absent the procedural safeguard of a pre-deprivation hearing before a neutral decisionmaker to determine whether Petitioner's detention bears a reasonable relation to the authorized statutory purposes of civil immigration detention: to ensure appearance at future immigration proceedings or to prevent danger to the community." *Perez Bueno*, 2026 WL 309934, at *4 (citing *Zadvydas*, 533 U.S. at 693–94).

3. The Government Lacks a Legitimate Interest

34. Respondents lack any interest in detaining Petitioner—who poses neither a flight risk nor a danger—without notice and any opportunity to be heard. *Hernandez v. Sessions*. 872 F.3d 976, 994 (9th Cir. 2017) ("[T]he government has no legitimate interest in detaining individuals who have been determined not to be a danger to the community and whose appearance at future immigration proceedings can be reasonably ensured by a lesser bond or alternative conditions."); *Garro Pinchi*, 792 F. Supp. 3d at 1035–36 ("[D]ue process requires the government to identify some interest beyond its own administrative practices to justify depriving an individual of her liberty without any pre-deprivation protections. Detention for its own sake, to meet an administrative quota, or because the government has not yet established constitutionally required pre-detention procedures is not a legitimate government interest."). "Although the Government has a legitimate interest in enforcing the immigration laws, that interest does not overcome the Fifth Amendment's requirement that constitutional procedural safeguards be provided before re-detaining a person who has been safely residing in the community." *R.R.T. v. Mullin*, No. 2:26-cv-03856-VBF-AYP, ECF No. 12 (C.D. Cal. May 1, 2026).

35. Moreover, Respondents cannot identify any reason why they could not have provided Petitioner with notice and an opportunity to be heard prior to detention. Indeed, "[t]he government's interest is further diminished where a person 'has consistently appeared for [his] immigration hearings . . . and [ ] does not have a criminal record." *Singh v. Andrews*, No. 1:25-CV-00801-KES-SKG-HC, 2025 WL 1918679, at *8 (E.D. Cal. July 11, 2025) (citation omitted) ("In immigration court, custody hearings are routine and impose a 'minimal' cost.")

36. In sum, Respondents' detention of Petitioner without a pre-deprivation hearing violated his procedural due process rights and therefore is unlawful. Under *Mathews*, the Petition must be granted and Petitioner must be released.

4. <u>Unlawful Warrantless Arrest</u>

37. Furthermore, Respondents in this district have been enjoined from engaging in the illegal warrantless arrests. *See Vasquez Perdomo v. Mullin*, No. 2:25-cv-05605-MEMF-SP, 2026 WL 2751388, at *31 (C.D. Cal. Sept. 2, 2026) (granting a preliminary injunction requiring "prearrest individualized determination by the arresting agent or officer of probable cause that the person being arrested is likely to escape before a warrant can be obtained."). The *Vazquez Perdomo* court explained that 8 U.S.C. § 1357(a)(2) and its implementing regulation "clearly require two determinations: (1) unlawful presence and (2) likelihood of escape." *Id.* at *20.

38. Importantly, *Vasquez Perdomo* requires the arresting officer to make an actual escape determination before the arrest. *Id.* at *22, *31. A post-arrest judicial assessment cannot replace the officer's required determination. The court rejected reliance on factors that could support an analysis when none occurred: "it matters little that such an analysis could be individualized and wide-ranging when Defendants, as a policy matter, are not conducting the analysis." *Id.* at *22. Likewise, the court explained that "the Government's use of 'boilerplate'

likelihood of escape language, combined with an insufficient actual likelihood of escape analysis, is impermissible." *Id.* at *23.

39. Therefore, because Petitioner was subject to a warrantless arrest, a bond hearing would not remedy this injury because it cannot supply the arrest authority absent when detention began and immediate release is required. *Domingo v. Kaiser*, Case No. 25-cv-05893 (RFL), 2025 WL 1940179, at *3 (N.D. Cal. July 14, 2025) ("Even if Petitioner received a prompt post-detention bond hearing under 8 U.S.C. §1226(a) and was released at that point, he will have already suffered the harm that is the subject of his motion; that is, his potentially erroneous detention."). This district has made similar decisions before. *See Valtierra Moreno*, No. 26-cv-04291-MAR, at *6-7 (finding immigration authorities violated 8 U.S.C. § 1357(a)(2) and ordering petitioner's immediate release).

**B. Petitioner's Detention is Not Reasonably Related to its Statutory Purpose and therefore Violates Substantive Due Process**

40. Petitioner was detained in violation of his substantive due process rights because his detention is not reasonably related to any statutory purpose. In the immigration context, the Supreme Court has recognized only two valid purposes for civil detention: (1) to mitigate the risk of flight—i.e. ensure noncitizens appear at future immigration proceedings—and (2) to prevent danger to the community. *Zadvydas*, 533 U.S. at 690–91; *Demore*, 538 U.S. at 528; *see Chen v. Noem*, No. 5:26-CV-00397-SSS-DTB, 2026 WL 425694, at *5 (C.D. Cal. Feb. 13, 2026) (holding "that application of the *Zadvydas* framework is not precluded by the administrative non-finality of Petitioner's removal order" and granting petitioner's release).

41. Petitioner presents neither a flight risk nor a danger and, therefore, his detention is not reasonably related to any legitimate purpose and violates the Due Process Clause. He has deep familial and community ties in the United States and there is no determination that he presents a danger.

42. At a bare minimum, "the Due Process Clause includes protection against unlawful or arbitrary personal restraint or detention." *Zadvydas*, 533 U.S. at 718 (Kennedy, J., dissenting).

43. Where, as here, an individual has lived for over twenty-four years, suddenly arresting and detaining him is paradigmatically arbitrary, and therefore a violation of even the most basic protections of the Due Process Clause.

**C. Petitioner's Deprivation of Due Process is a Product of Prejudiced Proceedings Structurally Incapable of Protecting Constitutional Rights**

44. Even if this Court were to find that a post-detention bond hearing could theoretically suffice in a re-detention case, the bond proceedings in Petitioner's case also violated due process because they were not conducted by a neutral adjudicator.

45. "A neutral judge is one of the most basic due process protections." *Castro-Cortez v. INS*, 239 F.3d 1037, 1049 (9th Cir. 2002), *abrogated on other grounds by Fernandez-Vargas v. Gonzales*, 548 U.S. 30 (2006); *see also Diouf v. Napolitano ("Diouf II")*, 634 F.3d 1081, 1091-92 (9th Cir. 2011) (neutral adjudication decreases the risk of erroneous deprivation). Yet at this time, Respondent DOJ cannot provide neutral adjudication. As a former senior EOIR official and military judge recently observed: "I don't think the immigration-court system is a court system . . . . What this Administration wants is a rubber stamp."[1]

46. Indeed, the immigration court system has been transformed into a body that is structurally incapable of upholding Petitioner's statutory and constitutional rights. EOIR and the BIA are subagencies within the Department of Justice ("DOJ") that house the immigration courts and their appellate body. In the last year the DOJ, EOIR, and the BIA, in apparent coordination with DHS, have systematically

[1] E. Tammy Kim, *Inside Donald Trump's Attack on Immigration Courts*, The New Yorker (Oct. 23, 2025), https://www.newyorker.com/inside-donald-trumps-attack-on-immigration-court.

dismantled the integrity of the immigration court system and turned it into an extension of DHS' deportation and detention operations.

47. As one District Court put it, "[t]hese developments…raise a serious question as to whether the constitutional guarantee of an impartial decisionmaker is being honored in any case brought before an IJ." *Haiguang Zheng v. Rokosky*, No. 26-cv-01689, 2026 WL 800203 (D.N.J. Mar. 23, 2026) (discussing DOJ's mass termination of IJs followed by recruitment of "deportation" judges and reminding that "judges need not 'shut our eyes to matters of public notoriety and general cognizance'") (quoting *Ho Ah Kow v. Nunan*, 12 F. Cas. 252, 255, F. Cas. No. 6546, 27 Pitts. Leg. J. 40 (C.C.D. Cal. 1879)).[2]

48. The evidence of EOIR's institutional capture falls into five categories, each independently sufficient to establish bias, but together demonstrating systematic destruction of judicial independence: (1) the ongoing mass-scale purge of immigration judges perceived as obstacles to DHS' enforcement agenda; (2) the parallel purge and reconstitution of the BIA, resulting in a *97 percent* pro-government decision rate; (3) the recruitment and installation of explicitly enforcement-aligned "deportation judges" with dramatically reduced qualifications; (4) EOIR policy directives establishing expectations that adjudications favor the government over noncitizens; and (5) explicit instructions to defy district court rulings that impede DHS' enforcement goals. Each category is addressed below.

[2] *See Garcia Ortiz v. Henkey*, No. 26-cv-43, 2026 WL 948275, at *3 (D. Idaho Apr. 7, 2026) (granting immediate release "given the broader irregularities in bond hearings across the country"); *Chavez Ochoa*, 2026 WL 541144, at *2 n.4 ("[I]mmigration judges who provide neutral adjudications have been removed, and bond is systematically denied after a pro forma hearing with a predetermined outcome."); *Avilez Aguinaga v. Warden*, No. 4:26-0137, 2026 WL 266510, at *1–2 (S.D. Tex. Feb. 2, 2026) (ordering immediate release rather than a bond hearing after acknowledging the argument that "immigration courts have been systematically transformed and are no longer capable of providing an impartial tribunal and individualized assessment…"); *Briceno Solano v. Mason*, No. 2:26-CV-00045, 2026 WL 311624, at *20 (S.D.W. Va. Feb. 4, 2026) (ordering immediate release of re-detained petitioner initially released by DHS on own recognizance, and finding "there is no chance any [bond] hearing that occurred would comport with due process"); *Umarov v. Mason*, No. 2:26-CV-00081, 2026 WL 381614, at *8 (S.D.W. Va. Feb. 11, 2026) (same) (quoting *Briceno Solano*, 2026 WL 311624, at *20).

1. The ongoing, mass-cale purge of Immigration Judges perceived as obstacles to DHS' enforcement agenda

49. By September 26, 2025, the administration had terminated 128 IJs.[3] Former New York IJ David K.S. Kim explained the targeting criteria: "I do not know the exact reason for my termination, but most of those dismissed, including myself, were judges with high asylum approval rates."[4]

50. The terminated and resigned judges report three consistent themes.

51. *First*, IJs faced explicit pressure to serve as instruments of mass deportation rather than neutral adjudicators. Former Baltimore IJ Emmett Soper, who was fired as an IJ after a nearly 20-year career as a civil servant at the DOJ, stated: "I think the current administration of the immigration courts does not fundamentally see the immigration courts as neutral decision-makers. I think that they see the immigration courts as a tool for this administration to advance its policy objectives."[5] Former San Francisco IJ Jeremiah Johnson similarly understood "the hint that they should be hearing cases a certain way, deciding cases a certain way. Move faster. Less due process, essentially."[6] Former San Francisco IJ George Pappas was even more direct: "We were told to facilitate deportation. . . . Due process is dead in immigration courts."[7]

52. *Second*, DOJ has created a pervasive climate of fear designed to ensure compliance amongst IJs. Former Baltimore IJ David C. Koelsch described it as "an atmosphere of paranoia and fear, which is exactly what they want."[8] Former Annandale IJ

[3] *Trump Administration Continues Firing Immigration Judges -- IFPTE responds*, IFPTE (Sept. 26, 2025), https://www.ifpte.org/news/trump-administration-continues-firing-immigration-judges-ifpte-respondsnbsp.
[4] Woo-Sun Lim, *Former Judge Highlights Legal Failures in U.S. Worker Detentions*, The Dong-A Ilbo (Sept. 20, 2025), https://www.donga.com/en/article/all/20250920/5859412/1.
[5] Geoff Bennett & Ali Schmitz, *Ousted Immigration Judge Describes Deepening Court Backlog*, PBS NewsHour (Nov. 12, 2025), https://www.pbs.org/newshour/show/ousted-immigration-judge-describes-deepening-court-backlog.
[6] Hilda Gutierrez, Michael Bott & Son Vo, *'An All-Out Attack on Immigration Court:' SF Immigration Judges Speak Out After Firings*, NBC Bay Area (Nov. 25, 2025), https://www.nbcbayarea.com/investigations/san-francisco-immigration-judges-speak-out-firings/3986850/.
[7] Marco Poggio, *Judges See An Immigration Court Gutted from Inside*, Law360 (Oct. 31, 2025), https://www.law360.com/articles/2381003/judges-see-an-immigration-court-gutted-from-inside.
[8] Poggio, *supra* note 7.

Anam Petit observed: "There's a climate of fear . . . . Judges feel like, if they step a toe out of line right now . . . or they're one [asylum] grant away from being fired because of the arbitrary nature of the firings."[9] Former New York IJ Carmen Maria Rey Caldas similarly described judges working "under 'constant threat' of getting fired if they don't follow certain rules from leadership."[10]

53. *Third*, IJs inevitably compromise their judicial independence when self-preservation requires favoring the government. Former San Francisco IJ Elizabeth Young explained: "I've talked to many of [the IJs still serving], and they're like, ' When I go into court, I am concerned about applying the law, but I'm also concerned that I should deny more, because if I don't, then I'll get fired.'"[11] Former Boston IJ Sarah Cade reached her breaking point: "I felt I might have to compromise my ethics and might be put in a place where I felt like I was going to be asked to violate due process. So I left and I went to private practice."[12]

54. The message to remaining IJs is that neutrality is a terminable offense. No adjudicator can remain impartial when faced with the choice between upholding due process and keeping their position. Any IJ assigned to a noncitizen's bond hearing now operates with the understanding that granting bond may cost them their livelihood. A current IJ revealed, "[t]he pressure is unrelenting."[13]

2. The BIA purge and resulting statistical evidence of bias.

55. A parallel purge has occurred at the BIA, which was reduced from 28 members to 15 members.[14] All Biden appointees at the BIA were fired. The statistical

---

[9] Eric Katz, *'Climate of Fear': Immigration Judges Say Functioning of Their Court System Is in Jeopardy Due to Trump's Firings*, Gov't Exec. (Nov. 14, 2025), https://www.govexec.com/management/2025/11/climate-fear-immigration-judges-say-functioning-their-court-system-jeopardy-due-trumps-firings/409544/.

[10] Isabela Dias, *"Fired for No Reason": Former Immigration Judges Speak Out Against Trump's Assault on the Courts*, Mother Jones (Oct. 9, 2025), https://www.motherjones.com/politics/2025/10/immigration-court-judge-trump-assault-purge-dhs-ice/.

[11] Poggio, *supra* note 7.

[12] Poggio, *supra* note 7.

[13] Kim, *supra* note 1.

[14] Ximena Bustillo & Rahul Mukherjee, *An Immigration Court Few Have Heard of Is Quietly Shaping Policy Behind the Scenes*, Nat'l Pub. Radio (Mar. 20, 2026), https://www.npr.org/2026/03/20/nx-s1-5707535/trump-immigration-detention-appeals-board-deportation ("[The BIA] has published a body of immigration case law that significantly narrows the due

impact is stark. In 2025, the reconstituted BIA issued 70 published opinions.[15] Of those, 97 percent favored the government.[16] By contrast, during the entire four-year span of the prior administration, the BIA issued 76 published decisions.[17] Of those, 46 decisions (60 percent) favored the government. The transformation from 60 percent to 97 percent pro-government outcomes—achieved through wholesale termination of one administration's appointees—speaks for itself. The BIA is not a neutral adjudicative body.

3. The Installation and Recruitment of Judges Aligned with partisan enforcement agenda

56. To replace purged judges, the DOJ launched recruitment for what it explicitly marketed as "deportation judges."[18] DHS—a party in immigration proceedings before EOIR—promoted these openings on social media with enforcement-focused language: "Bring the hammer down on criminal illegal aliens" and "Defend your communities, your culture, your very way of life."[19]

57. In addition, the DOJ has authorized up to 600 military lawyers to serve as temporary IJs for a renewable term not to exceed six months, while simultaneously eliminating requirements to serve as a temporary IJ.[20] Previously, temporary judge candidates were required to have served as a former IJ, appellate IJ, or administrative judge within another agency, or to have at least 10 years of immigration law experience. The administration removed those requirements

process and relief from deportation available for immigrants . . . . The White House has done that by shrinking the size of the board by nearly half — and stacking the remaining slate of 15 judges with President Trump's appointees.").

[15] Bustillo, *supra* note 14.

[16] Of the remaining two decisions: one decision was neutral (involving attorney sanctions), and one decision disfavored the administration.

[17] Exec. Off. for Immigr. Rev., Volume 28, U.S. Dep't of Just. (June 13, 2025), https://www.justice.gov/eoir/volume-28 (first decision, *Matter of Dikhtyar*, 28 I&N Dec. 214 (BIA 2021), issued Jan. 22, 2021).

[18] Dep't of Justice: You Be the Judge, https://join.justice.gov/ (last visited June 4, 2026).

[19] Dep't of Homeland Sec. (@dhsgov), Instagram (Nov. 21, 2025), https://www.instagram.com/p/DRVT8DmCQKD/ [https://perma.cc/RV57-87JX].

[20] Designation of Temporary Immigration Judges, 90 Fed. Reg. 41,883 (Aug. 28, 2025).

entirely, allowing "any attorney" to be selected as a temporary IJ.[21] It also reduced training to approximately two weeks—far less than the standard training for permanent IJs, which includes six weeks of initial training, one year of mentorship by an experienced judge, and two years of quarterly reviews.[22]

58. Corey Lewandowski, an adviser to then-DHS Secretary Noem, responded to the announcement by posting: "I see more deportations of illegal immigrants in the near future"[23]—an explicit acknowledgment of the mass deportation policy objective underlying these appointments and the erosion of institutional boundaries between DOJ and DHS.

59. In December, one of the appointed temporary judges was fired just a month into his six-month term. That judge, Christopher Day, had granted asylum claims in just over half the cases he heard.[24]

4. <u>EOIR Policy memoranda establishes expectations that adjudication prejudice noncitizens</u>

60. Beyond personnel changes, EOIR's new acting director, Sirce E. Owen, quickly issued "a string of sharply worded policy memos"[25] that immediately "[set] the tone for her leadership."[26] "Sources familiar with Owen described her as a 'restrictionist loyalist' with a reputation for denying cases."[27] The Catholic Legal Immigration Network observed that "these memos also seem intended to reshape

---

[21] Margy O'Herron, *Using Military Lawyers as Immigration Judges is Ill-Advised and Potentially Illegal*, Brennan Ctr. for Just. (Sept. 29, 2025), https://www.brennancenter.org/our-work/analysis-opinion/using-military-lawyers-immigration-judges-ill-advised-and-potentially.
[22] O'Herron, *supra* note 21.
[23] Corey R. Lewandowski (@CLewandowski_), X (Sept. 2, 2025, 1:47 PM), https://x.com/clewandowski/status/1962950546652070269 [https://perma.cc/939A-28QX].
[24] Joshua Goodman, *Military Lawyer Swiftly Fired from Immigration Bench After Defying Trump Deportation Push*, Military.com (Dec. 19, 2025), https://www.military.com/daily-news/2025/12/19/military-lawyer-swiftly-fired-immigration-bench-after-defying-trump-deportation-push.html.
[25] Kim, *supra* note 1.
[26] Dias, *supra* note 10.
[27] Dias, *supra* note 10.

EOIR, which is meant to be a neutral arbiter, into a politically driven tool advancing the Trump administration's clearly anti-immigrant views."[28]

61. Owen's policy directives include: a memorandum dated June 27, 2025, warning judges not to demonstrate "bias directed against DHS" or to be "adjudicatory outliers," at risk of "close examination and potential action";[29] a memorandum encouraging judges to deny asylum applications without full evidentiary hearings, styled as efficiency guidance but functioning as a directive to reduce due process protections;[30] and memorandums restricting IJs' ability to grant continuances[31] and administrative closure.[32]

5. EOIR has issued explicit directives to ignore district court rulings that impede DHS's policy objectives

62. Perhaps the clearest evidence that EOIR has abandoned its role as a neutral tribunal comes from its response to federal court orders protecting bond hearing rights. In *Maldonado Bautista v. Santacruz*, the Central District of California issued both declaratory and injunctive relief holding that noncitizens who entered without inspection but were not apprehended at the border are detained under § 1226(a), not § 1225(b)(2), and are therefore entitled to bond hearings. *Maldonado Bautista v. Santacruz*, No. 5:25-CV-01873-SSS-BFM, 2025 WL 3289861 (C.D. Cal. Nov. 20, 2025); *Maldonado Bautista v. Santacruz*, No. 5:25-CV-01873-SSS-BFM, 2025

[28] Cath. Legal Immigr. Network, Inc., *Navigating EOIR Directives Under Trump 2.0: Practical Guidance for Advocates and Programs* (Apr. 22, 2025), https://www.cliniclegal.org/file-download/download/public/77642.
[29] Exec. Off. for Immigr. Rev., Policy Memorandum 25-33, Neutrality and Impartiality in Immigration Court Proceedings (June 27, 2025), https://www.justice.gov/eoir/media/1404956/dl.
[30] Exec. Off. for Immigr. Rev., Policy Memorandum 25-28, Pretermission of Legally Insufficient Application for Asylum (Apr. 11, 2025), https://www.justice.gov/eoir/media/1396411/dl.
[31] Exec. Off. for Immigr. Rev., Policy Memorandum 25-27, Cancellation of Director's Memorandum 23-01 and Reinstatement of Policy Memorandum 19-13 (Mar. 21, 2025), https://www.justice.gov/eoir/media/1394086/dl.
[32] Exec. Off. for Immigr. Rev., Policy Memorandum 25-29, Cancellation of Director's Memorandum 22-03 (Apr. 18, 2025), https://www.justice.gov/eoir/media/1397161/dl.

WL 3288403, at *9 (C.D. Cal. Nov. 25, 2025), *amended and superseded by* No. 5:25-CV-01873-SSS-BFM, 2025 WL 3713987 (C.D. Cal. Dec. 18, 2025).[33]

63. Judge Sunshine Sykes certified a nationwide class and entered final judgment. *Id.* Rather than comply with the order, EOIR leadership directed all IJs to ignore the order. On January 13, 2026, Chief IJ Teresa L. Riley sent an email to all IJs instructing:

> Please provide the following guidance to all immigration judges forthwith: *Maldonado Bautista* is not a nationwide injunction and does not purport to vacate, stay, or enjoin *Yajure Hurtado*. Therefore *Yajure Hurtado* remains binding precedent on agency adjudications. For clarification, declaratory judgments differ from injunctions in that the former clarifies parties' legal rights and relationships without ordering specific action, while the latter is a court order compelling a party to do or stop doing a specific act. A declaratory judgment is not an equitable remedy and does not, by itself, have the effect of compelling specific action by a party. Thank you for your attention to this matter."[34]

64. The effect was immediate: Lawyers reported that IJs who had begun granting bond hearings in compliance with Judge Sykes' ruling reversed course after receiving Chief IJ Riley's directive.[35] IJs were placed in an impossible position—comply with a federal district court order and risk termination or defy the federal court and retain their positions.

65. On January 16, 2026, Judge Sykes issued a scathing order directly addressing the government's systematic defiance:

[33] Though the Ninth Circuit temporarily stayed Judge Sykes' December 18, 2025, judgment insofar as it extends beyond the Central District of California, the judgment remains in place as to the Central District of California. *Maldonado Bautista v. U.S. Dep't of Homeland Security*, No. 26-1044 (9th Cir. Mar. 6, 2026).

[34] Am. Immigr. Laws. Ass'n, Practice Alert: EOIR Issues Nationwide Guidance on *Maldonado Bautista*, AILA Doc. No. 26011404 (Jan. 16, 2026), *Palomera Baltazar v. Janecka*, No. 5:26-CV-00019-SSS-BFM at *2–3 (C.D. Cal. Jan. 16, 2026).

[35] *Immigration judges told to ignore rulings on bond hearings, documents show*, Massachusetts Lawyer Weekly (Jan. 20, 2026), https://masslawyersweekly.com/2026/01/20/immigration-judges-ignore-bond-hearing-rulings/.

> This matter is yet another in a slew of habeas petitions following the Court's ruling in *Bautista v. Santacruz* that has unfortunately become routine in this Court. . . . But individuals filing these habeas petitions are not to blame; rather, the current volume of habeas petitions and temporary restraining orders being filed can be attributed to Respondents' deliberate choice to continue defying the final judgment entered in *Bautista*. . . . Despite the clarity of the Court's previous orders and legal doctrines that preclude Respondents from relitigating issues at the heart of these requests, Respondents continue to manufacture arguments for sake of opposition. At this point in time, the Court can no longer confer Respondents with the benefit of the doubt as to the intent of their filings. Despite the final judgment in *Bautista*, it appears that immigration judges continue to rely on legal interpretations that were expressly found unlawful. . . .Respondents are collaterally estopped from relitigating the issue as to whether Bond Eligible Class members are entitled to the exact relief as provided in the *Bautista* final judgment. Accordingly, Respondents are collaterally estopped from relitigating this issue against all members of the Bond Eligible Class."

*Palomera Baltazar v. Janecka*, No. 5:26-CV-00019-SSS-BFM at *2–3 (C.D. Cal. Jan. 16, 2026).

66. Judge Sykes's findings are devastating: the government is not merely disagreeing with her legal conclusions—it is engaged in "deliberate" defiance, "manufactur[ing[ arguments," and instructing IJs to rely on "interpretations that were expressly found unlawful." *Id.* This is not a case of good-faith disagreement over statutory interpretation. It is systematic institutional defiance of federal court orders, orchestrated by EOIR leadership and enforced through the threat of termination.

67. No clearer evidence of institutional capture could exist: when presented with a federal court order protecting noncitizens' rights, EOIR's response was to order judges to violate it. The ultimate victims are detained noncitizens, who like Petitioner, remain detained in violation of their right to due process, and denied their fundamental right to have an impartial adjudicator determine whether their continued detention serves any legitimate purpose related to flight risk or community safety.

**D. Due Process Requires Petitioner's Immediate Release**

68. The proper remedy for Respondents' constitutional violations is release. "Once a constitutional violation has been found, a district court has broad powers to fashion a remedy." *Sharp v. Weston*, 233 F.3d 1166, 1173 (9th Cir. 2000). "[T]he purpose of habeas remedies is to 'put the defendant back in the position he would have been in if the constitutional violation never occurred.'" *Lujan v. Garcia*, 734 F.3d 917, 935 (9th Cir. 2013) (citation modified).

69. As discussed *supra*, Petitioner was entitled to and deprived of a *pre*-detention hearing before a neutral adjudicator. A post-deprivation hearing cannot remedy this due process violation and thus due process requires Petitioner's immediate release.

70. Numerous courts in this Circuit have endorsed the principle that a post-deprivation bond hearing cannot cure the lack of a pre-deprivation process. *E.g.*, *Garro Pinchi*, 792 F. Supp. 3d at 1035 (rejecting the contention that "any infringement of [the petitioner's] liberty interests can be adequately addressed if she requests a post-detention bond hearing after she has been redetained under section 1226(a)"); *Domingo*, No. 25-CV-05893-RFL, 2025 WL 1940179, at *3 ("Even if Petitioner-Plaintiff received a prompt post-detention bond hearing under 8 U.S.C. § 1226(a) and was released at that point, he will have already suffered the harm that is the subject of his motion: that is, his potentially erroneous detention."); *E.A. T.-B. v. Wamsley*, 795 F. Supp. 3d 1316, 1324 (W.D. Wash. 2025) ("[A] post-deprivation hearing cannot serve as an adequate procedural

safeguard because it is after the fact and cannot prevent an erroneous deprivation of liberty."); *Medrano-Rocha v. Santacruz*, No. CV-26-00404-KK-AGRX, 2026 WL 411355, at *6 (C.D. Cal. Jan. 23, 2026) ("Providing Petitioner with a post-detention hearing or other procedural remedy will not redress the constitutional violation Petitioner has suffered in being re-detained without a pre-deprivation hearing required by due process."); *Pelayo Ramirez v. Chestnut*, No. 1:26-CV-00529-DC-CSK, 2026 WL 766565, at *1 (E.D. Cal. Mar. 18, 2026) ("[T]he Due Process Clause requires that, in order for the government to re-detain a noncitizen who has been previously released on . . . humanitarian parole under 8 U.S.C. § 1182(d)(5), the government must provide a pre-deprivation bond hearing before a neutral arbiter . . . ."); *Colina-Meira v. Lyons*, 1:25-CV-1716-CSK, 2025, WL 3769424 (E.D. Cal. Dec. 31, 2025) (finding that petitioner's detention without written notice or a pre-deprivation hearing violated due process); *Gudavasov*, 2026 WL 712827, at *3 ("Other courts have similarly concluded that a post-detention bond hearing is insufficient to cure a violation of procedural due process arising from detention without a pre-deprivation hearing.").

71. Indeed, a post-deprivation bond hearing "would occur only after detention and thus fails to address an erroneous deprivation of liberty." *Lucena-Ojeda v. Noem*, No. 2:26-CV-00085-BAT, 2026 WL 279353, at *2 (W.D. Wash. Feb. 3, 2026) (citing *E.A. T.-B.*, 795 F. Supp. 3d at 1323–24); *see Anderson v. Chestnut*, No. 1:26-CV-01960-DAD-CKD, 2026 WL 809990, at *3 (E.D. Cal. Mar. 24, 2026) ("[A] post-deprivation bond hearing provided two months after petitioner's detention and only after she has sought federal habeas relief does not satisfy due process."); *Saballos Rosales v. Noem*, No. 5:26-CV-00112-JWH-MBK, 2026 WL 761371, at *3 (C.D. Cal. Mar. 16, 2026) ("[T]he post-detention process that Rosales did receive, and will receive, 'is no substitute for the pre-detention process she was owed.'") (quoting *Hasratyan v. Bondi*, No. 5:26-CV-00210-MCS-ADS, 2026 WL 288909, at *4 (C.D. Cal. Feb. 2, 2026)); *Ibragimov v. Santacruz*, No. 5:26-CV-01116-

MWC-KS, 2026 WL 790786, at *1, 3–4 (C.D. Cal. Mar. 18, 2026) (granting a TRO and ordering immediate release where an IJ found petitioner to be a flight risk because "a post-deprivation bond hearing cannot undo" the irreparable harms of immigration detention).

72. Accordingly, Petitioner's immediate release is the appropriate remedy. *Munaf v. Geren*, 553 U.S. 674, 693 (2008) ("The typical remedy for [unlawful] detention is, of course, release."); *Anderson*, 2026 WL 809990, at *3 ("[W]here a petitioner 'was released from civil immigration detention after his initial apprehension and is now re-detained,' . . . the proper remedy for a failure to provide such process is immediate release from detention.") (citing *Perez Bueno*, 2026 WL 309934, at *3–4).

**E. No Statute Bars this Court's Jurisdiction Over Petitioner's Claims**

73. This Court has jurisdiction to hear Petitioner's Claims

1. <u>8 U.S.C. 1252(g) Does Not Deprive this Court of Jurisdiction</u>

74. Supreme Court precedent requires that Section 1252(g) be read narrowly. *Reno v. American-Arab Anti-Discrimination Comm. (AADC)*, 525 U.S. 471, 482 (1999) (rejecting interpretation of the statute that would cover "the universe of deportation claims"); *Jennings v. Rodriguez*, 583 U.S. 281, 294 (2018) (cautioning against reading the statute to "sweep in any claim that can technically be said to 'arise from'" the three enumerated actions). Rather, § 1252(g) guards against "attempts to impose judicial constraints upon prosecutorial discretion." *AADC*, 525 U.S. at 485 n.9. Ninth Circuit precedent clearly establishes that review is not barred by Section 1252(g) where, as here, Petitioner raises Due Process claims. *Walters v. Reno*, 145 F.3d 1032, 1052 (9th Cir. 1998) ("[T]he statutory provision relied upon by the government [at § 1252(g)] does not prevent the district court from exercising jurisdiction over the plaintiffs' due process claims.").

75. Here, Petitioner does not challenge Respondents' prosecutorial discretion to commence his underlying removal proceedings, nor does he challenge the Attorney

General's decision to adjudicate his case or execute any order of removal. Instead, he challenges his July 2026 detention as a violation of his due process rights. Detaining Petitioner is not a "decision or action" to "commence proceedings, adjudicate his case[], or execute his removal order[.]" 8 U.S.C § 1252(g). The provision also "does not prohibit challenges to unlawful practices merely because they are in some fashion connected to removal orders." *Ibarra-Perez v. United States*, 154 F.4th 989, 997 (9th Cir. 2025). Thus Section 1252(g) does not bar due process claims like Petitioner's. *See Walters*, 145 F.3d at 1052; *Hasiholan v. Zoley*, No. 5:25-cv-03196 AH-DSR, 2026 WL 263645, at *3 (Jan. 20, 2026), *report and recommendation adopted* 2026 WL 256584 (Jan. 30, 2026) (collecting cases finding "that jurisdiction exists to adjudicate non-citizens' challenges to I.C.E. re-detentions").

2. The Jurisdictional Bar in 89 U.S.C. § 1252(b)(9) Does Not Apply

76. Similarly, § 1252(b)(9) does not apply where Petitioner does not have a removal order and where his challenge to immigration detention is collateral to the removal process. Section 1252(b)(9) "[b]y its terms . . . does not apply to federal habeas corpus petitions that do not involve final orders of removal. . . . Therefore, in cases that do not involve a final order of removal, federal habeas corpus jurisdiction remains in the district court . . . pursuant to 28 U.S.C. § 2241." *Nadarajah v. Gonzales*, 443 F.3d 1069, 1075–76 (9th Cir. 2006); *see Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 19 (2020) ("§ 1252(b)(9) does not present a jurisdictional bar where those bringing suit are not asking for review of an order of removal, the decision to seek removal, or the process by which removability will be determined." (internal quotation marks and ellipses omitted)); *Jennings,* 583 U.S. at 293 (pointing out that such an expansive interpretation of § 1252(b)(9) would render prolonged detention claims "effectively unreviewable"). Here, Petitioner's challenge to his

detention is "collateral to the removal process" and thus "do[es] not fall within the scope of § 1252(b)(9)." *Gonzales v. U.S. Immigr. & Customs Enf't,* 975 F.3d 788, 810 (9th Cir. 2020); *see J.E.F.M. v. Lynch,* 837 F.3d 1026, 1032 (9th Cir. 2016) ("[C]laims that are independent of or collateral to the removal process do not fall within the scope of § 1252(b)(9).").

**F. Administrative Exhaustion is Not Required for Habeas Relief**

77. Neither 8 U.S.C. § 2241 nor any relevant provision of the Immigration and Nationality Act ("INA") require the exhaustion of administrative remedies before filing a petition for a writ of habeas corpus. *Liang v. Ashcroft*, 370 F.3d 994, 998 (9th Cir. 2004) (citing *Castro-Cortez v. INS*, 239 F.3d 1037, 1047 (9th Cir. 2001)). And while courts may require administrative exhaustion as a prudential matter, such discretion applies only when the following factors are met: (1) agency expertise makes agency consideration necessary to generate a proper record and reach a proper decision; (2) relaxation of this requirement would encourage the deliberate bypass of the administrative scheme; and (3) administrative review is likely to allow the agency to correct its own mistakes and to preclude the need for judicial review. *Puga v. Chertoff*, 488 F.3d 812, 815 (9th Cir. 2007). If any of these factors are not satisfied, then courts may not require administrative exhaustion. *See Noriega-Lopez v. Ashcroft*, 335 F.3d 874, 881 (9th Cir. 2003).

78. Here, the *Puga* factors do not support a prudential exhaustion requirement. The legal questions raised—due process violations—are purely legal questions and require no agency expertise. *See Miri*, 2026 WL 622302, at *11 ("Miri was not required to exhaust administrative remedies given the questions of law at issue."). Courts are primarily responsible for resolving such questions, not agencies, and there is no agency mechanism to appeal Petitioner's re-detention. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385 (2024). Indeed, the Board of Immigration Appeals has consistently acknowledged that it is without jurisdiction to "consider constitutional challenges to the laws [it] administers." *Matter of Fede*, 20 I&N

Dec. 35, 36 (BIA 1989); *see Matter of Valdovinos*, 18 I&N Dec. 343, 345 (BIA 1982) ("[C]laims as to the unconstitutionality of the statutes and regulations administered by this Board are outside the scope of our jurisdiction."); *Matter of Fuentes-Campos*, 21 I&N Dec. 905, 912 (BIA 1997) ("It is well settled that we lack jurisdiction to rule on the constitutionality of the Act and the regulations we administer.").

79. Moreover, even if the *Puga* factors weighed in favor of requiring exhaustion, waiver may be appropriate if "administrative remedies are inadequate or not efficacious, pursuit of administrative remedies would be a futile gesture, irreparably injury will result, or the administrative proceedings would be void." *Liang v. Ashcroft*, 370 F.3d 994, 1000 (9th Cir. 1981) (quotations omitted). Here, the agency is particularly unlikely to correct its mistake, and Petitioner has serious concerns about the lack of neutrality in the immigration courts—a concern echoed by many district courts. *See supra* footnote 1.

80. Seeking agency review would further prolong Petitioner's unconstitutional detention, causing him irreparable harm. *Hernandez*, 872 F.3d at 987 (holding that, "even if the three *Puga* factors weigh in favor of prudential exhaustion," courts may waive exhaustion if "pursuit of administrative remedies" would lead to "irreparable injury"). Petitioner has already been detained and separated from his family for over two weeks. Every day that he remains detained constitutes a violation of his statutory and constitutional rights.

## CLAIMS FOR RELIEF

### COUNT ONE

### Violation of the Fifth Amendment to the U.S. Constitution

### *Procedural Due Process – Unlawful Arrest*

81. Petitioner repeats, re-alleges, and incorporates by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

82. Respondents have deprived Petitioner of his liberty without procedural protections required by the Due Process Clause.

83. Respondents' detention of Petitioner without pre-deprivation notice and a hearing violates his right to procedural due process, constituting a violation of the Fifth Amendment.

## COUNT TWO

### Violation of the Fifth Amendment to the U.S. Constitution

### ***Substantive Due Process***

84. Petitioner repeats, re-alleges, and incorporates by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

85. Respondents have deprived Petitioner of his liberty without any legitimate purpose in violation of his substantive due process rights under the Fifth Amendment.

86. Like any civil detention, immigration detention violates the Due Process Clause if it is not reasonably related to its statutory purpose. *Zadvydas*, 533 U.S. at 690 (citing *Jackson v. Indiana*, 406 U.S. 715, 738 (1972)); *see also Demore*, 538 U.S. at 527 (immigration detention must "bear[] a reasonable relation to the purpose for which the individual was committed") (citing *Zadvydas*, 533 U.S. at 690).

87. In the immigration context, the Supreme Court has recognized only two valid purposes for civil detention: (1) to mitigate the risk of flight and (2) prevent danger to the community. *Zadvydas*, 533 U.S. at 690–91; *Demore*, 538 U.S. at 528.

88. Here, no such determination has been made and there the most basic protections of the Due Process Clause have been violated.

## PRAYER FOR RELIEF

Petitioner respectfully requests that this Court:

1. Assume jurisdiction over this matter;
2. Issue a writ of habeas corpus ordering Respondents to immediately release Petitioner from custody;

3. Declare that Petitioner's arrest and detention violate the Due Process Clause of the Fifth Amendment, the Fourth Amendment and the Administrative Procedure Act;
4. Enjoin Respondents from transferring Petitioner outside this District or deporting Petitioner pending these proceedings;
5. Enjoin Respondents from re-detaining Petitioner unless his re-detention is ordered at a custody hearing before a neutral arbiter within seven (7) days of the issuance of a writ of habeas corpus in which the government bears the burden of proving, by clear and convincing evidence, that Petitioner is a flight risk or danger to the community; AND
6. Grant such further relief as this Court deems just and proper.

Date: October 02, 2026

Respectfully submitted,

Brendan Nafarrate
Attorney for Petitioner

**VERIFICATION**

I, Brendan Nafarrate, declare as follows:

I am an attorney admitted to practice law in the State of California. Because many of the allegations of this Petition require legal knowledge not possessed by Petitioner, I am making this verification on his behalf. I have read the foregoing Petition for Writ of Habeas Corpus and know the contents thereof to be true to my knowledge, information, or belief.

I certify under penalty of perjury that the foregoing is true and correct and that this declaration was executed on October 02, 2026.

Brendan Nafarrate
Attorney for Petitioner